RODNEY D. JOHNSON,                    )
      Plaintiff,                    )
                            )          Civil Action No. 2:10-cv-00043
v.                                    )          Judge Nixon/Brown
                            )
MICHAEL ASTRUE,                       )
Commissioner of Social Security,      )
      Defendant.                    )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title XVI and Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 20, 25). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 12). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I. INTRODUCTION

Plaintiff first filed for DIB on August 9, 2000 and for SSI on August 1, 2000 (protective filing date), with an alleged onset date beginning June 30, 1997. (Tr. 227). His claims were denied initially and on reconsideration. (Tr. 234). At Plaintiff's request, a hearing was held on March 6, 2002. (Tr. 227, 534-68). At the hearing, Plaintiff amended his alleged onset date to

1

May 30, 2000.  (Tr. 227).  On April 25, 2002, the ALJ issued an unfavorable decision.  (Tr. 224-33).  Plaintiff requested review by the Appeals Council on July 8, 2002.  (Tr. 238).  The Appeals Council acted on May 27, 2005, remanding the case to an ALJ because Plaintiff's record could not be located.  (Tr. 240-42).  A second hearing was held on January 9, 2006.  (Tr. 569-98).  ALJ Evans issued an unfavorable opinion on May 22, 2006.  (Tr. 14-24).  On review, and at the Commissioner's request, the United States District Court for the Middle District of Tennessee remanded Plaintiff's case to the Appeals Council, which vacated the decision and remanded the case to an ALJ.  (Tr. 614-17, 622).  A video hearing was held on July 8, 2009, and the ALJ also heard Plaintiff's supplemental SSI case filed on May 23, 2006.  (Tr. 722-57).  The ALJ issued an unfavorable decision on February 25, 2010.  (Tr. 599-613).[1]

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2004.

2.    The claimant has not engaged in substantial gainful activity since May 30, 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following combination of impairments: carpal tunnel syndrome, degenerative disc disease, diabetes with neuropathy, asthma, dyspnea, chest pain, elevated cholesterol, high blood pressure, gastroesophageal reflux disease, irritable bowel syndrome, knee pain, migraine headaches, anxiety, and depression (20 CFR 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),

---

[1] The Magistrate Judge can in no way condone the Commissioner's handling of this case from a procedural view.  To take three years from July 8, 2002 to May 27, 2005 to determine they had lost the record is inexcusable.  Following a second hearing a full year later and an appeal, the case was remanded for a third hearing on December 8, 2008, which was held on July 8, 2009.  It is inconceivable that a disability case would need nearly 11 years for resolution.  However, inefficiency is not a legal ground for a favorable recommendation.

416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he would require a sit/stand option; he cannot do a job that involves dealing with the public; he is limited to following simple one and two step instructions; he can only occasionally push or pull arm or leg controls; he can only occasionally bend or stoop; he cannot crawl or climb; and he cannot work at unprotected heights or around hazardous machinery.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on September 16, 1974 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 30, 2000 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Plaintiff filed this Complaint on May 5, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD[2]

Plaintiff was born on September 16, 1974. He is married and lives with his wife, who is

---

[2] Given the number of Plaintiff's complaints and the duration of this application, the Magistrate Judge has focused primarily on those areas necessary to evaluate the alleged errors in the ALJ's decision.

disabled due to paranoid schizophrenia, and two minor children. Plaintiff has an 11th grade education and has past work experience as a security guard, oil changer, janitor, photocopy machine operator, and furniture deliverer. Plaintiff claims he is disabled because he suffers from back and leg pain, carpal tunnel, COPD, asthma, degenerative lumbar disc disease with persistent radiculopathy, diabetes with neuropathy, dyspnea, chest pain, elevated cholesterol, high blood pressure, gastroesophageal reflux disease, irritable bowel syndrome, migraine headaches, anxiety, depression, and seizures.

Plaintiff's primary care physician, Dr. Drake, treated him for several years, apparently ending in late 2002. (Tr. 149-64, 215-20, 382). Dr. Drake's treatment notes reflect Plaintiff visiting the emergency room on December 7, 1994 because he was suicidal and suffering from major depressive disorder. (Tr. 160, 346-47). On January 17, 1996, Dr. Drake noted Plaintiff suffered from chronic anxiety and insomnia; he prescribed Elavil. (Tr. 159).

Plaintiff saw Dr. Jestus on April 29, 1998, complaining of his left leg falling asleep and carpal tunnel in his wrist. (Tr. 99-100). Dr. Jestus did not believe Plaintiff's left leg falling asleep was abnormal and suggested no further work up on that complaint. *Id*. He recommended a splint for Plaintiff's carpal tunnel or, if that was not effective, surgery. *Id*.

Dr. Chung diagnosed Plaintiff with carpal tunnel syndrome in both wrists on September 30, 1998. (Tr. 92-97). Dr. Chung noted the severity of the carpal tunnel syndrome was moderate in the left wrist and mild in the right. *Id*. He also suggested medications for Plaintiff's migraines. (Tr. 96). Plaintiff reported left lower extremity weakness and numbness, which Dr. Chung believed was episodic and not progressive; he recommended Plaintiff refrain from positions that produce the effect, such as crossing his leg. *Id*.

Plaintiff saw Dr. Jestus again on June 16, 2000. (Tr. 98). Dr. Jestus noted Plaintiff's left

leg paresthesias had progressed, and Plaintiff had frank back pain and sciatica. *Id*. An MRI performed on May 30, 2000 showed a small central disc bulge and spinal stenosis at L4/5 and spondylolysis at L5/S1. (Tr. 98, 174). Dr. Jestus recommended weight loss and exercise, with surgery being a last resort. (Tr. 98).

Plaintiff complained to Dr. Drake of chronic back pain on October 10, 2000, stating he had treated it primarily with ibuprofen. (Tr. 154). On November 14, 2000, Plaintiff began complaining of dizziness and tingling into his side and hip while walking. (Tr. 155). Dr. Drake scheduled an MRI for November 16, 2000 and referred Plaintiff to Dr. Rodriguez-Cruz. (Tr. 154, 172). Plaintiff saw Dr. Rodriguez-Cruz in November and December 2000. (Tr. 144-47). Dr. Rodriguez-Cruz recommended a myelogram, which was normal. *Id*. He stated that he had nothing to offer Plaintiff surgically, and he recommended Plaintiff seek care at a pain clinic. *Id*.

On February 9, 2001, Dr. Drake completed a Medical Request for Exemption for Plaintiff so that he could receive food stamps. (Tr. 150-51). Dr. Drake stated Plaintiff suffered from chronic low back pain of unknown duration. *Id*.

On March 9, 2001, Plaintiff sought Dr. Drake's referral to a pain clinic. (Tr. 150). He stopped taking Lortab and Elavil due to drowsiness, and the Lortab was not alleviating his back pain. *Id*. Dr. Drake prescribed Soma. *Id*. On May 2, 2001, Dr. Drake noted Plaintiff had been referred to Dr. Kay Son at a pain clinic. *Id*.

Plaintiff saw Dr. Faccia for pain management from March 6, 2001 through July 17, 2001. (Tr. 165-69). On May 7, 2001, Plaintiff told Dr. Faccia his pain was increased by activity and decreased by medication and trigger point injections. (Tr. 167). Without treatment, his pain was a 10 on a 10-point scale. *Id*. Plaintiff received trigger point injections at that appointment. *Id*. On July 17, 2001, Plaintiff complained to Dr. Faccia that he could not move after the last trigger

point injections, and he declined any further injections.  (Tr. 165).  Plaintiff stated his pain with medication and trigger point injections was a 6 on a 10-point scale.  *Id*.

On December 19, 2001, Plaintiff saw Dr. Drake and indicated he wanted to try physical therapy instead of injections.  (Tr. 218).  Dr. Drake referred Plaintiff to White County Physical Therapy, where Plaintiff began therapy in January 2002.  (Tr. 185-90, 211-13).  Plaintiff was discharged from physical therapy on February 7, 2002, for noncompliance.  (Tr. 211).  Plaintiff had missed three consecutive appointments and lacked motivation.  *Id*.  When Plaintiff saw Dr. Drake on February 11, 2002, Dr. Drake asked Plaintiff to reestablish his physical therapy and "give it a real try instead of the half-hearted effort that he has put forth thus far."  (Tr. 215).

Plaintiff saw Dr. Nagaraj on February 22, 2002 for lower back pain and dyspnea.  (Tr. 365-66).  He told Dr. Nagaraj that an MRI had showed "bulging disc at several levels."  *Id*.  Plaintiff had a negative cervical myelogram on the same date.  (Tr. 368-69).  Dr. Nagaraj prepared a Functional Capacity Assessment for Plaintiff on March 1, 2002.  (Tr. 221-22).  He opined Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk for 2 hours out of an 8-hour workday, and could occasionally balance but could never climb, stoop, kneel, crouch, crawl, or twist.  *Id*.  Dr. Nagaraj could not evaluate how many hours Plaintiff could sit in a typical 8-hour workday, but he noted Plaintiff stated he could sit less than 30 minutes and preferred standing in Dr. Nagaraj's exam room.  *Id*.  Plaintiff should also limit pushing, pulling, and reaching, and his pain was frequently severe enough to interfere with his concentration.  *Id*.  Plaintiff told Dr. Nagaraj he would need to take unscheduled breaks every 30 minutes, and Plaintiff perceived he was incapable of even low-stress jobs.  *Id*.  Dr. Nagaraj noted Plaintiff "feels more pain than what appears on MRI."  *Id*.

Plaintiff was evaluated by Dr. Joseph L. Johnson, an examining physician for the Social

Security Administration, on September 18, 2002. (Tr. 370-74). Dr. Johnson noted Plaintiff's range of motion, leg strength, and walking on toes and heels tests were "probably" limited due to some anxiety. (Tr. 371). He noted Plaintiff complained of pain with mild palpation on the lower back, but there was no spasm of the lower back muscles. *Id*.

On November 26, 2002, Dr. Drake examined Plaintiff and noted Plaintiff was "deconditioned significantly." (Tr. 382). Dr. Drake believed Plaintiff needed "a little more activity to help improve his quadriceps strength." *Id*.

Plaintiff sought treatment for his mental issues at Volunteer Behavioral Health Care System ("VBHC") beginning on February 14, 2003. (Tr. 409-72). Plaintiff complained of depression, mood swings, hearing voices, suicidal ideation, and trauma from past sexual abuse. (Tr. 409-12). He was diagnosed with major depressive disorder, post-traumatic stress disorder ("PTSD"), and anxiety disorder. (Tr. 412). A functional assessment based on the Tennessee Clinically Related Group form was completed on February 14, 2003. (Tr. 467-69). Plaintiff was evaluated as moderately impaired in activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change. *Id*. His Global Assessment of Functioning ("GAF") score was 50, with a range of 65 to 45 in the last 6 months. (Tr. 469). Plaintiff was placed in Consumer Group 1, meaning he was a person with severe and persistent mental illness. *Id*.

On January 15, 2004, Plaintiff was reevaluated using the Tennessee Clinically Related Group form. (Tr. 470-72). Plaintiff was again rated as moderate in all four categories and placed in Consumer Group 1. *Id*. His GAF score was again 50, with a range of 50 to 45 in the last 6 months. *Id*.

On February 11, 2004, Plaintiff's therapist noted that he "question[ed] malingering for

disability services." (Tr. 414). The therapist noted Plaintiff was changing primary care physicians and therapists. *Id.*

Plaintiff reported being unable to recall names and dates and forgetting his destination while driving on March 10, 2004. (Tr. 415). He also noted he had been working around the house installing a toilet and moving furniture. *Id.* On April 30, 2004, Plaintiff stated he had been working for his landlord to earn some extra money. (Tr. 449). Plaintiff reported often doing house cleaning and trying to help his wife with other chores around the house on May 15, 2004. (Tr. 450). He stated he does most of the outside work and was helping his landlord several hours per week. *Id.* On August 23, 2004, Plaintiff told his therapist he was not well enough to work but did odd jobs for his neighbors. (Tr. 454). Plaintiff was discharged from VBHC care on November 24, 2004, because he had no appointments in three months. (Tr. 465).

Plaintiff first saw Dr. Kemkar, a primary care physician, on February 17, 2003. (Tr. 524-26). Dr. Kemkar treated Plaintiff for lower back pain, diabetes, high blood pressure, and COPD.[3] (Tr. 473-526). Dr. Kemkar ordered an MRI of Plaintiff's lumbar spine on July 27, 2004. (Tr. 390). The MRI showed no evidence of spondylolysis. *Id.* Dr. Kemkar first noted Plaintiff's seizure disorder on October 15, 2008, and he stated at a follow-up appointment that the seizures improved on Lyrica. (Tr. 688-704). Dr. Kemkar treated Plaintiff for poison ivy rash on December 3, 2008 and March 4, 2009. *Id.*

In 2006, Plaintiff filed a federal tax return reporting his wife's SSI income as his self-employed income in order to receive an earned income credit. (Tr. 652-60). Plaintiff filed an

---

[3] On April 2, 2003, Dr. Kemkar noted Plaintiff had a history of smoking and should quit, but other records and Plaintiff's testimony suggest Plaintiff never smoked. (Tr. 520-21).

amended return, but there is no indication he has repaid the refund. *Id.*

Plaintiff resumed treatment at VBHC in June 2008 and continued until May 21, 2009. (Tr. 666-86). A Tennessee Clinically Related Group form was completed on April 9, 2009. Plaintiff was mildly impaired in activities of daily living; moderately impaired in interpersonal functioning; moderately impaired in concentration, task performance, and pace; and markedly impaired in adaptation to change. (Tr. 666-68). He was categorized as Group 3, persons who are formerly severely impaired, and his GAF score was 60. *Id.*

Dr. Marvin Blevins examined Plaintiff on June 22, 2009, at his attorney's request, and prepared a Medical Source Statement. (Tr. 712-18). Dr. Blevins noted Plaintiff had suffered an injury to his back in 1997, which had been treated conservatively, and that Plaintiff used a cane to ambulate. *Id.* He indicated Plaintiff suffered from petit mal seizures, used Lyrica for peripheral neuropathy, suffered from COPD with no history of tobacco use, and had an impaired gait. *Id.* Dr. Blevins opined Plaintiff could lift less than 10 pounds occasionally or frequently, could stand less than 2 hours in a typical 8-hour workday, could sit for approximately 4 hours in an 8-hour workday, and was incapable of working even a low-stress job. *Id.*

Plaintiff was approved for three years of Tennessee state family assistance on July 21, 2009. (Tr. 719). The form indicated Dr. Kemkar's and VBHC's records were considered, and Plaintiff suffered from depression, anxiety, diabetes, peripheral neuropathy, and COPD. *Id.*

As noted in the procedural history, Plaintiff testified three times before an ALJ. On March 6, 2002, Plaintiff testified that he went to school through the eleventh grade, although his records were lost, and he never received a GED. (Tr. 543). He testified he has constant lower back pain and sometimes has shooting pains up his back and down his leg if he moves the wrong way. (Tr. 548). His constant pain is approximately an eight or nine on a ten-point scale, and his

pain is worsened by moving around or standing in one spot. (Tr. 549). He did not experience relief from injections at the pain clinic, and he could not move from the waist down for nearly three days after the injections. (Tr. 550). He testified that the physical therapists overworked him once and then violated his doctor's orders to start out slow by working him twice as hard when he went back. *Id*. He can walk approximately 10 to 15 minutes before he has to stop, due to his pain and bronchitis. (Tr. 549). Plaintiff also suffers from migraine headaches three to four times per week that interfere with his concentration and sometimes cause vomiting. (Tr. 551-52). He has been prescribed pain medication for the headaches, and he wears prescription sunglasses because he is sensitive to light. *Id*. Plaintiff testified he has breathing problems, has used an inhaler since he was 10 or 11 years old, and has to stop and catch his breath after climbing five or six steps. (Tr. 554).

Plaintiff mows the yard, but he has to stop approximately every 15 to 20 minutes. (Tr. 556). He can lift less than 10 pounds. (Tr. 557). He shops for groceries with his wife, who is disabled due to paranoid schizophrenia, and he sometimes has to lean on the cart or wait a few minutes due to pain. *Id*. Plaintiff drives two to three times a week. (Tr. 558-59). He has problems sleeping due to pain. (Tr. 559).

At his January 9, 2006 hearing, Plaintiff testified that his most severe medical problem was his back. (Tr. 580). His leg problems and mental problems would come next. (Tr. 581). Plaintiff wore wrist braces to the hearing due to his carpal tunnel syndrome. (Tr. 582). Plaintiff testified that his back problem was the result of a work accident six or seven years before the hearing. (Tr. 583). Plaintiff has never had surgery on his back, and his attempts at physical therapy and injections were unhelpful. (Tr. 583-84). Plaintiff's back pain prevented him from lifting his eight-month-old son from the time he weighed approximately 16 pounds. (Tr. 584).

Plaintiff stated he can sit for approximately 15 minutes and stand for approximately five minutes before needing to move. (Tr. 584-85). Plaintiff takes Flexeril and Tramadol for his pain. (Tr. 586). He stated they give him very little relief from his pain. *Id*. He is unable to take stronger medication due to a heart problem. *Id*. Without medication, his pain is a ten out of ten; with medication, it is an eight out of ten. (Tr. 587).

Plaintiff's legs periodically go numb, sometimes when walking. (Tr. 587). He became afraid to carry his son out of fear he would drop him. *Id*. His leg problems began in approximately 2004. (Tr. 587-88). According to Plaintiff, his doctors believe the leg problems are due to the nerves in his back and possibly from nerve damage due to Plaintiff's diabetes. (Tr. 588). Plaintiff has problems with balance and walking and can only walk a short distance before staggering. (Tr. 588-89).

Plaintiff testified he has headaches three to four times per week, lasting from three to four hours to all day. (Tr. 589). He sometimes has nausea with the headaches. (Tr. 589-90). He wears sunglasses due to light sensitivity. (Tr. 590).

Plaintiff was diagnosed with diabetes in approximately 2003. (Tr. 590). He has been taking Metformin for his diabetes. (Tr. 591). His blood sugar levels had been under control, but at the time of the hearing they were between 200 and 300. *Id*. Plaintiff testified he tries to follow a diabetic diet but has problems doing so. (Tr. 577).

With regard to his mental problems, Plaintiff testified that he takes Depakote to help control his anger. (Tr. 591-92). Plaintiff stated he had been treated at Plateau Mental Health Center but no longer goes there because of long waits to see the doctor. (Tr. 592). Depakote is now prescribed by his primary care physician. *Id*.

Plaintiff testified he spends most of his days with the baby, listening to the radio, cleaning

his guns sometimes, and keeping up his fishing poles. (Tr. 594). He tries to help with the housework, rinsing the dishes for about five minutes before needing to sit down. *Id*. When he changes his son's diaper, he ends up on his knees by the end of the process. (Tr. 594-95). He mows the yard using a riding mower, although he is incapacitated for two to three days after mowing. (Tr. 595).

Plaintiff further testified that he has problems sleeping and sometimes takes a nap in the afternoon. (Tr. 595-96). He also gets confused sometimes and forgets where he is going, due to low blood sugar. (Tr. 596). Plaintiff also suffers from breathing problems and uses an inhaler up to four or five times a day. (Tr. 597-98).

On July 8, 2009, Plaintiff testified at his third hearing. (Tr. 722-57). Plaintiff and his attorney first explained his 2006 IRS issues and indicated he would be filing an amended tax return. (Tr. 725-29). Plaintiff also stated he had been treated as an inpatient at respite care in January 2009, although there were no records submitted as of the time of the hearing. (Tr. 729-30).

Plaintiff testified that he and his wife now have two sons, who were four and two at the time of the hearing. (Tr. 731). The ALJ asked who is taking care of the minor children, if Plaintiff and his wife were both disabled due to mental limitations. *Id*. Plaintiff stated that they have some help from family, but he and his wife take care of the children. (Tr. 732).

Plaintiff stated that his carpal tunnel had worsened and he had to use plastic dishes, because he was dropping plates and glasses. (Tr. 732-33). He stated that he had seen three doctors regarding his carpal tunnel syndrome, and he believed only one of the doctors had recommended surgery. (Tr. 742). Plaintiff wore two splints on his wrists for the hearing. (Tr. 753). The ALJ asked how old the splints were, and the Plaintiff stated they were a few months

old, but he had had other pairs in the past.  (Tr. 753).

Plaintiff also testified that he has had seizures for years but never got treatment for them.
(Tr. 733).  They last for 10 to 15 minutes, and he can no longer drive alone.  *Id.*  Plaintiff stated
that he takes Lyrica for his seizures and neuropathy.  (Tr. 734-35).

Plaintiff described his work history, stating that he worked longest as a furniture delivery
person.  (Tr. 735).  He also worked as a construction worker, an oil changer, and a night
watchman.  (Tr. 735-36).  His last job, as a night watchman, ended because it was a temporary
position.  (Tr. 737-38).

Plaintiff testified that he hurts from the top of his head to the back of his neck, as well as
feeling like his lower back is broken.  (Tr. 739).  He described his back pain as a 9.5 on a 10-point
scale.  (Tr. 740).  When he changes position and lies down, his level of pain is approximately a 7
out of 10.  *Id.*  Plaintiff takes Lyrica and a muscle relaxer to help with the pain.  (Tr. 739).  He did
not believe the Lyrica helped with the back pain, and the muscle relaxer made him drowsy.  *Id.*
Plaintiff sometimes uses a back brace for relief, as well.  (Tr. 741-42).

Plaintiff stated that he suffers from neuropathy in his feet and legs.  (Tr. 741).  He
described the pain in his feet and ankle like an electric shock and added that he sometimes has
shooting pains in his groin.  *Id.*  He testified that he sometimes falls as a result of these shooting
pains, and, as a result, he uses a cane to walk.  *Id.*

Plaintiff has a nebulizer treatment two to three times per day.  (Tr. 743-44).  He is affected
by weather, perfumes, and chemicals.  (Tr. 743).  Plaintiff believes his breathing problems have
caused difficulty with his sleep, but he has not done a sleep study.  (Tr. 744).  He runs out of
breath after a short walk, and he uses his inhaler frequently.  (Tr. 744-45).

Plaintiff stated he can lift less than 10 pounds, because he drops a gallon of milk when he

picks it up. (Tr. 745). He is unable to pick up his children. *Id*. He can stand in one spot for no more than two or three minutes. *Id*. He can sit for 15 to 20 minutes without hurting. *Id*.

Plaintiff stated that he suffers from depression and anger. (Tr. 746). He has anger outbursts at least three times a week. *Id*. He tries to control his outbursts and hold himself back from doing anything. (Tr. 746-47). He has difficulty being around a lot of people, to the extent that he sometimes needs to leave his wife in the store to finish the grocery shopping. (Tr. 748, 751). He also avoids family gatherings. *Id*. Plaintiff testified he went to respite care in January 2009 because his wife's medicine was not working and he started having suicidal thoughts. (Tr. 747).

Plaintiff states he is unable to pick up a broom and hold on to it. (Tr. 749). He does mow the lawn, although he is in bed for three days afterward. *Id*. The ALJ noted that Plaintiff spent nearly an hour fingering and flipping his cane between his fingers. (Tr. 752). Plaintiff stated he believed it was a habit, and his carpal tunnel numbness comes and goes. *Id*.

The Vocational Expert, Jo Ann Bullard, testified that an individual who is limited to unskilled work, requires a sit/stand option, and cannot work with the public would not be able to perform any of Plaintiff's past work. (Tr. 754-55). Such an individual could perform a light job with a sit/stand option, including textile checker (2,600 jobs in Tennessee), marker (5,600 jobs in Tennessee), and laundry folder (6,000 jobs in Tennessee). (Tr. 755). This opinion would not change if the individual was limited to occasional pushing and pulling of arm or leg controls, occasional bending or stooping, no crawling or climbing of ladders, and no unprotected heights or hazardous machinery. (Tr. 756). If the individual were additionally limited, however, to lifting less than 10 pounds, standing less than two hours in an eight-hour workday, and sitting about four hours in an eight-hour workday, there would be no jobs he could perform. (Tr. 756).

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff cites four alleged errors committed by the ALJ. First, the ALJ erred in rejecting the opinion of Dr. Nagaraj, a treating physician. Second, the ALJ erred in failing to address the records of Dr. Kemkar and the evaluation and opinion of Dr. Blevins. Third, the ALJ erred in discounting the reports of Plaintiff's treating psychologists. Fourth, the ALJ erred in discounting Plaintiff's complaints of pain.

A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.  Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his

or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.      The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physicians

---

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments.  20 C.F.R. § 404.1527(d)(2).  Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time.  20 C.F.R. § 404.1527(d)(2)(i)-(ii).  However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion.  20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

As an initial matter, the ALJ relied primarily on the opinions of Dr. Drake, Plaintiff's primary care physician, and Dr. Johnson, who performed a consultative physical examination of Plaintiff in 2002.  (Tr. 21-24).[5]  Dr. Drake, in particular, had a long treatment relationship with Plaintiff, lasting nearly ten years, until 2002.

With regard to Dr. Nagaraj, the ALJ noted that Dr. Nagaraj indicated Plaintiff appeared to

---

[5] The ALJ incorporated by reference the medical evidence as summarized in the 2006 decision.

feel more pain than what would have been apparent from the MRI he ordered in March 2002. (Tr. 21, 23, 221-22).[6] Moreover, it appears that Dr. Nagaraj had a brief treating relationship with Plaintiff. The medical records reflect that he was treated by Dr. Nagaraj twice in February and March 2002. (Tr. 221-22, 365-66). Dr. Nagaraj saw him only once before completing a Functional Capacity Assessment. The assessment itself is limited in that Dr. Nagaraj indicated he could not assess Plaintiff's sit requirements, and Plaintiff's subjective complaints of pain exceeded that which could be accounted for in the objective evidence. (Tr. 221-22).

The ALJ briefly addressed Dr. Kemkar's treating notes in his decision. (Tr. 23). He noted Dr. Kemkar diagnosed Plaintiff with non-insulin diabetes mellitus in September 2003 and advised Plaintiff to lower his triglycerides, and stop smoking. *Id.* The ALJ noted that Plaintiff was diagnosed with a seizure disorder and treated with Lyrica. (Tr. 609-10).[7] The ALJ found Plaintiff's complaints of seizures to be less than credible, as he claims to have suffered from them for years without telling any of his physicians. While the Magistrate Judge does not believe the ALJ should have completely rejected a diagnosed condition without citing to contradicting medical evidence, there is sufficient evidence in this case to support the ALJ's decision. Even assuming Plaintiff's seizure disorder is genuine, Dr. Kemkar's notes reflect Plaintiff's seizures were stabilized with Lyrica. (Tr. 698-700). On November 14, 2008, in fact, Dr. Kemkar noted Plaintiff had "[n]o further seizure activity" while on Lyrica. (Tr. 698). Moreover, Dr. Kemkar provided little treatment for Plaintiff's back pain, his primary complaint. In 2008 and 2009, Plaintiff sought

---

[6] Dr. Nagaraj has been also referred to in the ALJ's opinions as Hagara and Najara.

[7] The ALJ indicated skepticism that Lyrica, typically a pain medication, was prescribed as an anticonvulsant. (Tr. 610). It appears, however, that Lyrica is commonly prescribed as an anticonvulsant, although it is typically used with other seizure medications. *See* http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152825.pdf.

treatment from Dr. Kemkar for a variety of problems, including shortness of breath, diabetes, numbness, dizziness, seizures, poison ivy, sinus drainage, decreased hearing from earwax, chest pain, and urinary frequency. (Tr. 688-704). Plaintiff apparently saw Dr. Kemkar only once during an approximately 9-month period for lower back pain, on April 21, 2009. (Tr. 690). There is no indication Plaintiff was even prescribed pain medication at that appointment. *Id.* In short, the ALJ had sufficient evidence for rejecting Dr. Kemkar's notes to the extent they contradicted his finding that Plaintiff was not disabled.[8]

The ALJ also properly rejected Dr. Blevins's Medical Source Statement. (Tr. 712-18). Dr. Blevins saw Plaintiff only once, for the purpose of completing the statement. Given the extremely brief nature of the treating relationship, the ALJ properly concluded Dr. Blevins's opinion was not entitled to enhanced weight. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). While the Magistrate Judge believes the ALJ had sufficient reason to discredit the opinion of Dr. Blevins, the ALJ could have better outlined his specific reasons for rejecting this source.

Plaintiff also briefly raises the issue that the ALJ apparently did not rely on the medical exemption forms for food stamps Dr. Drake completed. (Tr. 151). On February 9, 2001, Dr. Drake stated Plaintiff could not work for an unknown amount of time due to chronic low back pain. *Id.* Plaintiff was also approved for three years of food stamps based on medical impairments on July 21, 2009. (Tr. 719). This determination is not binding on the Social Security Administration, however. 20 C.F.R. § 404.1504. Because the ALJ had sufficient evidence for

---

[8] In his Response, the Commissioner states that Dr. Kemkar completed a medical evaluation form for Tennessee Department of Human Services Family Assistance. (Tr. 719). It appears, however, that Dr. Kemkar's notes were relied on by the agency in making its decision; it is not clear that Dr. Kemkar completed an evaluation of Plaintiff for this purpose.

finding Plaintiff was not disabled, the ALJ's decision not to rely on this determination was not error.

D.      The ALJ Properly Evaluated Plaintiff's Mental Residual Functional Capacity

The ALJ gave little weight to the opinions of Plaintiff's treating psychologists, because they were not consistent with the overall medical evidence of record. Plaintiff claims this is error due to Plaintiff's history of severe mental problems and GAF scores.[9]

When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment." 20 C.F.R. § 404.1520a. The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* The ALJ must also evaluate the "B" criteria, which rate the claimant's degree of functional limitation and consist of four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* The ALJ's application of these criteria must be

---

[9] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

documented in his decision. *Id.*

The ALJ clearly evaluated both the "A" and "B" criteria required. He noted Plaintiff's psychological medical evidence repeatedly indicated improvement with medication and therapy. (Tr. 610). The ALJ also believed Plaintiff was malingering, an opinion apparently shared by one of his therapists. (Tr. 414). The ALJ also evaluated Plaintiff's functional limitations in the "B" criteria and noted that Plaintiff performs the necessary daily activities, including the majority of child care for his two young sons, and is able to mow his lawn, help with some household chores, and go grocery shopping nearly every day. (Tr. 610). The Magistrate Judge therefore believes the ALJ properly evaluated Plaintiff's evidence of mental impairment and had substantial evidence for determining Plaintiff's residual functional capacity.

E.     The ALJ Properly Evaluated Plaintiff's Credibility

The ALJ found that Plaintiff's complaints of the intensity, persistence, and limiting effects of his symptoms were not credible. (Tr. 609). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id.* Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

The ALJ found several reasons to doubt Plaintiff's credibility. Plaintiff has worked around the house, putting in a toilet and moving furniture. (Tr. 415). He has done odd jobs for his landlord and neighbors. (Tr. 450, 454). He testified he is able to mow the lawn, drive, clean his

guns and fishing equipment, and go through boxes in his "junk room" on a regular basis. (Tr. 609). The ALJ noted that Plaintiff "wore nearly new hand splints to the hearing and proceeded to finger, flip, spin, manipulate, and shift his cane from hand to hand and from finger to finger for nearly the entire 50 minute hearing." *Id.* In spite of this, Plaintiff testified he is sometimes unable to hold a cane and often drops plates and glasses. *Id.*

Moreover, Plaintiff's therapist noted his suspicions that Plaintiff was malingering. (Tr. 414). His physical therapist and Dr. Drake, his primary care physician, both noted that Plaintiff had a lack of motivation in his physical therapy. (Tr. 211, 215). The Magistrate Judge believes the ALJ's credibility finding is supported by substantial evidence.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and the action be **DISMISSED**

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this  17th  day of February, 2011.


/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge